## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA ex rel.
DEBRA FRENN, DNS, FACHE, and
DEBRA FRENN, DNS, FACHE, individually,

        Plaintiffs,

**FILED IN CAMERA
AND UNDER SEAL**

        v.

Case No.  16-cv-842

RUSK COUNTY, RUSK COUNTY MEMORIAL
HOSPITAL, and CHARISSE OLAND,

        Defendants.

## COMPLAINT

Debra Frenn, on behalf of the United States of America, and individually ("Relator"), by and through her undersigned attorneys, brings this civil action against the Defendants for violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("Act").

### JURISDICTION AND VENUE

1.    Relator brings this action under the Act to recover damages and civil penalties on behalf of the United States of America arising out of Defendants' submission of fraudulent claims for medical services to the United States Government through the Medicare Program---or causing their submission.

2.     Under § 3732 of the Act, this court has exclusive jurisdiction over actions brought under the Act. Jurisdiction is also conferred under 28 U.S.C. § 1331 as this civil action arises under the laws of the United States.

3.     Venue is proper in this district under 28 U.S.C. § 1391, as well as § 3732 of the Act, as Defendants reside and do business in, and the subject transactions took place in, this judicial district.

## FILING UNDER SEAL

4.     Under the Act, this Complaint is to be filed in camera and remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders.  The Government may elect to intervene and proceed with the action within sixty days after it receives the Complaint.

## PARTIES TO THE ACTION

5.     Plaintiff United States of America, funds certain medical care for eligible citizens through Medicare and and other agencies and programs acting through the Centers for Medicare and Medicaid Services ("CMS").

6.     Relator, Debra Frenn, DNS, FACHE, is a United States citizen currently residing in Two Rivers, Wisconsin 54241. Relator brings this action on behalf of the United States of America, and individually.

7.     From November, 2013 until she resigned effective November 12, 2015 Relator was Chief Patient Care Officer and member of the executive team for Defendant Rusk County Memorial Hospital. She was responsible for all patient care areas

2

including Nursing and Pharmacy. Relator reported directly to Defendant Charisse Oland, who was the hospital's Chief Executive Officer ("CEO").

8.      Defendant Rusk County Memorial Hospital is a federally certified critical access hospital with attached clinic located at 900 College Avenue W., Ladysmith, Wisconsin 54848. The hospital has twenty-five beds and provides inpatient care for acute, swing-bed and observation patients. The hospital is owned and operated by Defendant Rusk County.

9.      Defendant Rusk County is a governmental unit organized under the laws of the state of Wisconsin with its central administrative office located at 311 Miner Avenue E., Ladysmith, Wisconsin 54848.

10.     Defendant Charisse Oland is CEO of the hospital and administrator of its Board of Trustees. At all times relevant Defendant Oland aided, abetted and/or participated in one or more of the subject violations, as further alleged herein.

11.     Relator brings this action based on her direct knowledge, information, and belief acquired through her duties as Chief Patient Care Officer for Rusk County Memorial Hospital and her observations of and personal interactions with Defendant Oland and other agents and employees of the hospital.

12.     Relator believes that she is the original source of the information material to the false claims alleged herein and has provided and will continue to provide the Government with related and material evidence and information as the Government may request.

13.     As more fully alleged below, from the period November 17, 2014 through at least August 3, 2015, and possibly longer, Defendants, with the aid and assistance of their agents and employees, knowingly presented false claims to the United States Government through the Medicare and Medicaid Programs in violation of the False Claims Act by, inter alia, seeking payment for hospital inpatient and swing bed patient services, which were not rendered in compliance with material regulatory and statutory preconditions of payment, and by assisting, certifying and/or submitting claims for payment containing false or misleading information, which they otherwise knew did not comport with Medicare and Medicaid rules and regulations.

14.     CMS would not have provided reimbursement for the fraudulently billed services but for Defendant's violations, which have resulted in damages to the integrity of the Medicare and Medicaid Programs and the United States of America.

## GOVERNING RULES AND REGULATIONS

### Medicare regulations governing inpatient services

15.     Medicare is a federally funded health insurance program created by Title XVII of the Social Security Act and provides insurance coverage for people over the age of 65, or individuals with disabilities. Medicare is administered by CMS.

16.     Medicare Part A, or Hospital Insurance, is available at no cost to those who are eligible and provides coverage for inpatient hospital stays, nursing home care and hospice services.

17.     As a condition of payment for hospital inpatient services under Medicare

Part A, section 1814(a) of the Social Security Act [42 U.S.C. 1395f] requires that a physician certify that such services are medically necessary and required to be given on an inpatient basis. See, CMS Guidance, Hospital Inpatient Admission Order and Certification, January 30, 2014 at p. 1.

18.    The order to admit as an inpatient is a critical component of the physician certification and, therefore, is also required for hospital inpatient coverage and payment under Medicare Part A. Id.

19.    The physician certification, which includes the order to admit, is considered together with other documentation in the medical record as proof that hospital inpatient services were reasonable and necessary. Id.

20.    Medicare regulations governing inpatient hospital admissions provide that, "For purposes of payment under Medicare Part A, an individual is considered an inpatient of a hospital, including a critical access hospital, if formally admitted as an inpatient pursuant to an order for inpatient admission by a physician or other qualified practitioner in accordance with this section and §§ 482.24(c), 482.12(c), and 485.638(a)(4)(iii) of this chapter for a critical access hospital**."**

21.    The regulations provide that the "physician order must be present in the medical record and be supported by the physician admission and progress notes, in order for the hospital to be paid for hospital inpatient services under Medicare Part A." 42 C.F.R. 412.3 (a).

22.    The regulations further state that the order to admit "must be provided by

a qualified and licensed practitioner who has admitting privileges at the hospital as permitted by State law, and who is knowledgeable about the patient's hospital course, medical plan of care, and current condition" and that the practioner "may not delgate the decision (order) to another individual who is not authorized by the State to admit patients, or who has not been granted admitting privileges applicable to that patient by the hospital's medical staff." 42 C.F.R. 412.3 (b).

23.     The order to admit constitutes a required component of physician certification of the medical necessity of inpatient critical access hospital services. 42 C.F.R. 412.3(c) and  42 C.F.R. part 424 subpart B.

24.     The order must be furnished at or before the time of the inpatient admission. 42 C.F.R. 412.3 (d)

25.     As a condition of receiving Medicare payments Rusk County Memorial Hospital must comply with the physician certification and admission order requirements set forth in Section 1814(a) of the Social Security Act, 42 C.F.R. 412.3 and 42 C.F.R. part 424 subpart B.

26.     42 C.F.R. 482.12(c)(1), which is incorporated by reference in 42 C.F.R. 12.3, provides that the hospital governing body must  ensure that every Medicare patient is under the care of a doctor of medicine or osteopathy or other designated practitioner i.e. a qualified dentist, podiatrist, optometrist, chiropractor or clinical psychologist.

27.     42 C.F.R. 482.12(c)(2) further provides that if "a Medicare patient is admitted by a practitioner not specified in paragraph (c)(1) of this section" the hospital

6

governing body must ensure "that patient is under the care of a doctor of medicine or osteopathy."

28.     As a condition of receiving Medicare payments Rusk County Memorial Hospital must also comply with Medicare regulations governing critical access hospitals. 42 C.F.R. part 485 subpart F.

29.     These regulations provide that a critical access hospital must have a physician on staff to provide medical supervision of the health care staff. 42 C.F.R. 485.631(b)(1)(i).

30.     In conjunction with mid-level practitioners a physician must periodically review critical access hospital patient records, provide medical orders and provide medical care services to inpatients. 42 C.F.R. 485.631(b)(1)(iii).

31.     A physician must periodically review the records of all inpatients cared for by mid-level practitioners. 42 C.F.R. 485.631(b)(1)(iv)

32.     A physician must be present in the critical access hospital "for sufficient periods of time to provide overall medical direction, consultation and supervision of the healthcare services the [critical access hospital] furnishes." State Operations Manual ("SOM"), Appendix W, Tag C-0261, Interpretative Guidelines § 485.631(b)(2).

33.     Being "present" in the critical access hospital means being physically on-site in the hospital. Id.

34.     These regulations provide that for each patient receiving health care services a critical access hospital must maintain a record that includes, "All orders of

doctors of medicine or osteopathy or other practitioners, reports of treatments and medications, nursing notes and documentation of complications, and other pertinent information necessary to monitor the patient's progress, such as temperature graphics, progress notes describing the patient's response to treatment." 42 C.F.R. 485.638(a)(4)(iii),

35.     This information is necessary to monitor the patient's condition and, therefore, must be promptly filed in the medical record so that health care staff can provide appropriate care." SOM, Appendix W, Tag C-0306, Interpretative Guidelines § 485.638(a)(4)(iii).

36.     The medical record must contain all practitioners' orders properly authenticated. Id.

37.     All or part of the history and physical exam ("H&P") may be delegated to other practitioners in accordance with State law and hospital policy, but a physician must co-sign the H&P and assume full responsibility for the H&P. SOM, Appendix W, Tag C-0305, Interpretative Guidelines § 485.638(a)(4)(ii).

38.     A physician must co-sign admission orders written by mid-level practitioners prior to patient discharge. If the inpatient order is not properly documented in the patient medical record, the critical access hospital should not submit a claim for Medicare Part A payment. CMS Guidance, Hospital Inpatient Admission Order and Certification, January 30, 2014, at p. 4.

39.     Medicare regulations permit mid-level practitioners, as allowed by the

8

State, to admit patients to critical access hospitals. However, Medicare patients must be under the care of a physician if admitted by a mid-level practitioner and the patient has any medical or psychiatric problem that is present on admission or develops during admission that is outside the scope of practice of the admitting practitioner. SOM, Appendix W, Tag C-0268, Interpretative Guidelines § 485.631(c)(3).

40.     Evidence of being under the care of a physician must be in the patient's medical record and, as applicable, the patient's medical record must demonstrate physician responsibility and care. Id.

### Medicare regulations governing swing bed patient services

41.     Rusk County Memorial Hospital also provides skilled nursing services to swing bed patients and thus, the hospital is also required to comply with various regulatory requirements applicable to skilled nursing facilities.

42.     In particular, in order to be reimbursed by Medicare and Medicaid for skilled nursing or skilled rehabilitation services the services must be ordered "by a physician." 42 C.F.R. 409.31(a)(1)

43.     Only a physician can admit swing bed patients to a critical access hospital. 42 C.F.R. 409.31(a)(1); Medicare Benefit Policy Manual, Ch. 8, sec.  30.2.1.

44.     Medicare regulations provide that swing bed patients must be under the care of a physician and that a mid-level practitioner will not be the primary practitioner providing care. 42 C.F.R. 485.645(d); SOM, Appendix W, Tag C-0364, Interpretative Guidelines, § 483.10(d)(1)

## Applicable Wisconsin Statutes and Regulations

45.     Wisconsin Medicaid statutes provide that inpatient hospital services are covered only if "prescribed by a physician." Wis. Stat. 49.46 (2)(b)2.e.

46.     Similarly, state Medicaid regulations provide that "the following services require a physician's order or prescription to be covered under MA [Medical Assistance] . . . inpatient hospital services", Wis. Admin Code DHS 107.02 (2m), and that inpatient hospital services are covered "only if provided under the direction of a physician." Id. DHS 107.08(1).

47.     Wisconsin hospital regulations also provide that a person "may be admitted to a hospital only on the recommendation of a physician, dentist or a podiatrist with a physician designated to be responsible for the medical aspects of care." Wis. Admin. Code DHS 124.05(g)(1)

48.     The governing body of the hospital is required to establish a policy, which requires that every patient be under the care of a physician, dentist or podiatrist. Wis. Admin. Code DHS 124.05(g).

49.     Wisconsin regulations permit mid-level practitioners to admit patients to a critical access hospital but only if the patient is under the care of a physician during the inpatient stay; the mid-level practitioner knows which physician will be accepting responsibility for the patient based on consultation with and recommendation of the physician; and, mid-level admitting practices are clearly outlined in the medical staff bylaws and clearly documented in the patient's record and the mid-level's privileges.

10

## STATEMENT OF FACTS

50.     On or about November 17, 2014 Rusk County Memorial Hospital implemented a hospitalist program. Hospitalists are medical practitioners whose primary focus is care of patients in the hospital setting.

51.     The business plan for the hospitalist program provided for three Advanced Practice Nurse Prescribers ("APNP") each working a one-week on and two-weeks off rotation.

52.     The plan also provided for a physician who would serve as a collaborating physician for the APNP hospitalists as required by state law and Medicare and Medicaid regulations.

53.     Wisconsin law provides that APNPs "shall work in a collaborative relationship with a physician." Wis. Admin. Code N 8.10(7).

54.     The collaborative relationship is "a process in which the APNP is working with a physician, in each other's presence when necessary, to deliver health care services within the scope of the practitioner's professional expertise." Id.

55.     The collaborative relationship must be documented in writing. Id.

56.     Prior to implementing the hospitalist program Defendant Oland and the hospital's Chief Financial Officer ("CFO"), David Kuehn, asked Relator what was required to be included in a collaborative physician agreement.

57.     Relator responded that the collaborative agreements must provide for medical direction and supervision of the APNP hospitalists consistent with all state and

11

federal laws and regulations including meeting all Medicare and Medicaid requirements set forth in paragraphs 15-49, *supra*.

58.     Defendant Oland and CFO Kuehn, however, disregarded Relator's advice and subsequently drafted collaborative agreements, which omitted most of what Relator said was necessary for the hospitalist program to comply with Medicare and Medicaid regulations.

59.     Defendant Oland knew or should have known that compliance with the Medicare and Medicaid regulations were material, express conditions of payment for inpatient and swing-bed services provided by the hospital.

60.     Prior to implementing the hospitalist program Defendant Oland visited two hospitals, which had implemented nurse practitioner hospitalist programs, one of which had proper in-person involvement of physicians in the day-to-day care of inpatients and swing bed patients and one that had telemedicine physician participation, which required a waiver from the state.

61.     Defendant Oland also attended presentations and webinars and/or was provided with written materials from the presentations and webinars, which made clear that APNP hospitalists were required to work in collaboration with a physician.

62.     The presentations and seminars and/or written materials from the presentations and seminars made clear that Medicare and Medicaid beneficiaries admitted for hospital inpatient services by APNP hospitalists must be under the care of a physician and that evidence of being under the care of a physician must be in the

patient's medical record.

63.     The presentations and seminars and/or written materials from the presentations and seminars made clear that a physician must co-sign all inpatient admission orders written by APNP hospitalists; that a physician must co-sign all H&Ps completed by APNPs and assume full responsibility for the H&Ps; and, that a physician must periodically review all inpatient records whose treatment was managed by an APNP and must sign the records after the review has been completed.

64.     On or about June 4, 2013 Defendant Oland implemented a Corporate Compliance policy acknowledging the hospital's obligation to provide health services in a manner that complied with state and federal law including the federal False Claims Act and Wisconsin's Medicaid Fraud Statute.

65.     Despite the clear requirement that APNP's work in collaboration with a physician and that the physician be actively involved in inpatient and swing bed patient care, Rusk County Memorial Hospital implemented its hospitalist program on November 17, 2014 without the required collaborative physician relationship and/or medical direction and supervision of APNP hospitalists.

66.     In mid-June 2015 Rusk County Memorial Hospital hired Dr. Linda Klein as its Chief Medical Officer.

67.     On or about August 3, 2015 Relator, Defendant Oland, Dr. Klein, and one of the APNP hospitalists attended a webinar on Medicare and Medicaid laws related to hospitalist billing.

13

68.     The webinar covered many of the same topics that were covered at previous webinars and which were also discussed at leadership meetings, including the requirements that a physician collaborator must be personally involved in inpatient care, the physician's involvement must be documented in the patient's medical record and the physician must co-sign all admission orders and H&Ps completed by the APNP hospitalists.

69.     Following the webinar Defendant Oland told Relator to have Dr. Nogler and Dr. Benson sign off on patient charts back dated to November 17, 2014 to attest they were actively involved in the ongoing care of each patient's care while they were an inpatient or swing-bed patient at Rusk County Memorial Hospital.

70.     Relator asked Defendant Oland whether she was sure she wanted to do this because she did not think Dr. Nogler or Dr. Benson would sign because they were not present for the patient's ongoing care and Relator was told "no", she should ask them to sign.

71.     Relator did not believe it was ethical or legal to ask Dr. Nogler and Dr. Benson to sign charts for care and services they did not render.

72.     Relator concluded she could not carry out Defendant Oland's directive and the following day, August 6, 2015, she sent an email to Defendant Oland and CFO David Kuehn, who also served as Corporate Compliance Officer, expressing her concerns and stating she would not be asking the physicians to sign charts for care and services they did not provide.  Specifically, she stated:

"Yesterday you requested that I ask Dr. Benson and Dr. Nogler to cosign the hospitalists' charts from when they were collaborators. I do not feel comfortable doing that without consulting with our corporate compliance leader, David. The reason I am asking for consultation from corporate compliance is because while Dr. Klein has actively contributed to the patient care with the hospitalists, Dr. Nogler did not, and I do not know of a time that Dr. Benson was on our inpatient unit."

73.     After receiving the email Defendant Oland arranged for a conference call with Relator and three attorneys from Quarles & Brady to discuss back co-signing of patient charts. The attorneys advised against back co-signing of charts and, with regard to the absence of physician involvement in ongoing patient care said, "Hopefully, no one will find out."

74.     Many bills were submitted to Medicare and Medicaid and collected on for services that were not delivered to inpatients or swing bed patients in compliance with applicable laws and regulations as set forth in paragraphs 15 through 49, above.

75.     During the period November 17, 2014 through at least August 3, 2015 there were a minimum of 125 and up to 250 monthly APNP hospitalist patients for which services were billed at a rate of $3,369.74 a day for inpatient services and $2,536.45 a day for swing bed services.

76.     Relator was told three times that Rusk County Memorial Hospital was not going to do anything about the billing for APNP hospitalists starting November 17, 2014 because it was unlikely that regulators would find out.

77.     Relator was told this once on a phone call with the attorneys from Quarles

15

& Brady, once in Defendant Oland's office with Dr. Klein present and a third time when Defendant Oland mentioned the Department of Health was just there eighteen months ago and would not be back for another four years, so it was unlikely they would find anything in their survey.

78.     In performing the acts described above, Defendants, through their own acts and through their various officers, directors, agents and/or employees, knowingly presented or caused to be presented to an agency, officer, or employee of the United States government false or fraudulent claims for payment in violation of 31 U.S.C. §3729(a)(1)(A).

79.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

80.     In accepting Medicare and Medicaid patients Defendants agreed not to make false statements or misrepresentations of material facts concerning requests for payments, 42 U.S.C. § 1320a--7b(a)(2), and to support all claims for payment with proper documentation. 42 U.S.C. § 1320c—5(a)(3), which Defendants failed to do.

## COUNT I—FALSE CLAIMS ACT

### Fraudulent Billing of Inpatient Hospital Services

81.     Relator incorporates by reference all prior paragraphs as if fully set forth herein.

82.     During the period November 17, 2014 through at least August 3, 2015

16

Defendants fraudulently billed Medicare and Medicaid for inpatient hospital services provided by APNP hospitalists at Rusk County Memorial Hospital.

83.     When providing inpatient hospital services APNPs must work in collaboration with a physician; patients admitted by APNPs must be under the care of a physician and evidence of being under the care of a physician must be in the patients' medical records.

84.     A physician must co-sign admission orders written by APNPs prior to patient discharge; a physician must co-sign all H&Ps completed by APNPs and assume full responsibility for the H&Ps; and a physician must periodically review and sign all inpatient records whose treatment is/was managed by APNPs.

85.     Dr. Nogler and Dr. Benson were the designated "collaborating physicians" for the APNP hospitalists at Rusk County Memorial Hospital, however, neither physician provided medical care services to inpatients, completed or co-signed admission orders or H&Ps or periodically reviewed and signed inpatient medical records completed by the APNPs.

86.     Each time Defendants submitted a bill to Medicare or Medicaid for inpatient services rendered by APNPs at Rusk County Memorial Hospital, Defendants made material representations that the APNPs were working in collaboration with a physician.

87.     Specifically, Defendants made material representations that a physician was personally involved in patient care; that a physician had co-signed admission

17

orders written by the APNPs; that a physician had co-signed all H&Ps completed by the APNPs and assumed full responsibility for the H&Ps; and that a physician had reviewed and signed all inpatient records whose treatment was managed by the APNPs.

88.     Each time Defendants submitted a bill to Medicare or Medicaid when, in fact, the APNP hospitalists were not working in collaboration with a physician, they committed fraud.

89.     In submitting to Medicare and Medicaid bills for inpatient services provided by the APNPs, Defendants acted in deliberate ignorance or reckless disregard for the fact that the APNPs were not qualified to provide inpatient care without the oversight and supervision of a collaborating physician.

90.     All bills submitted to Medicare and Medicaid by Defendants for inpatient services, which were not provided under the care of a physician working in collaboration with the APNP hospitalists, were materially false and fraudulent.

91.     Had Medicare and Medicaid known that inpatient services were not provided under the care of a physician working in collaboration with the APNPs they would not have reimbursed the hospital for such services.

92.     In billing Medicare and Medicaid for inpatient services, which did not comply with material statutory and regulatory requirements, as described above, Defendants knowingly made false or fraudulent claims for payment for which Defendants are liable under the False Claims Act.

18

## COUNT II—FALSE CLAIMS ACT

### Fraudulent Billing of Swing Bed Patient Services

93.     Relator incorporates by reference all prior paragraphs as if fully set forth herein.

94.     During the period November 17, 2014 through at least August 3, 2015 Defendants fraudulently billed Medicare for swing bed services, which were not provided in compliance with material statutory and regulatory requirements, specifically, the requirements that only a physician can admit swing bed patients; that swing bed patients must be under the care of a physician; and that a mid-level practitioner, or APNP, may not be the primary practitioner.

95.     Each time Defendants submitted a bill to Medicare or Medicaid for swing bed patient services provided by Rusk County Memorial Hospital, Defendants made material representations that swing bed patients were admitted by and under the care of a physician and that an APNP was not the primary practitioner.

96.     Each time Defendants submitted a bill to Medicare or Medicaid when, in fact, an APNP rather than a physician admitted the swing bed patient, they committed fraud.

97.     Each time Defendants submitted a bill to Medicare or Medicaid when, in fact, an APNP rather than a physician was the primary practitioner providing care, they committed fraud.

98.     In submitting to Medicare and Medicaid bills for swing bed services,

19

Defendants acted in deliberate ignorance or reckless disregard for the fact that the APNPs were not qualified to serve as the primary practitioners providing care for swing bed patients and/or were not qualified to admit swing bed patients.

99.     Had Medicare and Medicaid known that an APNP rather than a physician admitted the swing bed patient and/or that an APNP rather than a physician was the primary practitioner providing care, they would not have reimbursed the hospital for such swing bed services.

100.     In billing Medicare and Medicaid for swing bed services, which did not comply with material statutory and regulatory requirements, as described above, Defendants knowingly made false or fraudulent claims for payment for which Defendants are liable under the False Claims Act.

## PRAYER FOR RELIEF

101.     Wherefore, Relator seeks relief on Counts I and II as follows:

a.     Judgment against the Defendants in an amount equal to three times the damages sustained by the United States as a result of Defendants' conduct;

b.     A civil penalty of not less than $5,500 and not more than $11,500 for each and every false claim that Defendants presented or caused to be presented to the United States;

c.     That Relator, as Qui Tam plaintiff, be awarded the maximum amounts allowed pursuant to the False Claims Act;

d.     Reasonable attorneys' fees, costs, and expenses which Relator necessarily

20

incurred in bringing and pursuing this case.

## JURY DEMAND

102.    Relator, Debra Frenn, hereby demands a trial by jury on all claims pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated at Madison, Wisconsin this 22nd day of December 2016.

Respectfully submitted:

FOX & FOX, S.C.

s/Mary E. Kennelly

_____

Mary E. Kennelly
SBN #1019036
Counsel for Relator
124 West Broadway
Monona, Wisconsin 53716
Telephone: 608/258-9588
Facsimile: 608/258-9105
Email: mkennelly@foxquick.com